CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 24 2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DIANA LYNN GOINS, | ) | |
| Plaintiff, | ) | Civil Action No. 4:16-cv-00056 |
| | ) | |
| v. | ) | |
| | ) | REPORT & RECOMMENDATION |
| NANCY A. BERRYHILL, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Diana Lynn Goins asks this Court to review the Acting Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the parties' briefs and oral arguments, and the applicable law, I find that the Commissioner's final decision is supported by substantial evidence and must be affirmed.

## I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th

Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Goins filed for DIB and SSI on December 5, 2012, alleging disability because of anxiety and depression, lower back pain radiating into her left leg and knee, neck pain, bilateral shoulder pain, and "significant difficulty" using her left arm. *See* Administrative Record ("R.") 90, 101, ECF Nos. 9-1, 17-1. She said that she had been disabled since February 4, 2012, which is the same date she left her most recent job. R. 90–91, 101–02, 223. The Commissioner rejected Goins's claims initially in August 2013 and on reconsideration in April 2014. R. 112–13, 138–39. On September 1, 2015, Goins appeared with counsel for an administrative hearing before ALJ Marc Mates. R. 591. Goins and a vocational expert ("VE") testified at the hearing. R. 597–609, 610–14.

ALJ Mates issued an unfavorable decision on October 27, 2015. R. 72–84. He first found that Goins had not worked since February 4, 2012, and that she met the Act's insured status requirements through June 30, 2015.[1] R. 74. At step two, ALJ Mates found that Goins had "the following severe impairments: left shoulder difficulty status-post rotator cuff injury, degenerative disc disease, and obesity." *Id.* None of these impairments, alone or combined, met or medically equaled one of the presumptively disabling impairments listed in the Act's regulations. R. 76–77. The ALJ next evaluated Goins's residual functional capacity ("RFC") based on all of her medical impairments. R. 77–82. He determined Goins could perform "light

---

[1] To qualify for DIB, Goins "must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 656; *see* 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. § 404.131 (2015). Goins's date last insured is not relevant to her claim for SSI. *See Redditt v. Colvin*, No. 7:13cv391, 2014 WL 2800820, at *4 n.3 (W.D. Va. June 18, 2014); 20 C.F.R. §§ 416.202, 416.501 (2015).

work"[2] that involved never climbing ladders, ropes, or scaffolds, "occasional overhead reaching

and pushing/pulling with [the] non-dominant left arm," and occasional "postural activities, like

bending and stooping." R. 77. This RFC ruled out Goins's return to all of her past relevant work.

R. 82–83. Finally, based on this RFC finding and the VE's testimony, ALJ Mates concluded that

Goins was not disabled after February 4, 2012, because she still could perform certain widely

available occupations, such as cashier and laundry sorter. R. 83–84. The Appeals Council denied

Goins's request for review, R. 1–5, and this appeal followed.

### III. Discussion

Goins's arguments on appeal each challenge some aspect of ALJ Mates's RFC

determination. *See* Pl.'s Br. 19–28, ECF No. 19. First, she argues that the ALJ should have given

"greater weight" to a treating physician's opinion that chronic pain severely restricts her physical

capacity to perform work-related activities. *See id.* at 20–23. Second, she objects that the ALJ's

RFC determination is not supported by substantial evidence because he did not conduct the

required "function-by-function analysis" and did not "make any specific findings regarding

[Goins's] inability to maintain a static work posture, her need to lie down during the day, or her

manipulative limitations[.]" *Id.* at 23–24; *see also id.* at 28. Finally, Goins asserts that ALJ Mates

did not adequately explain why he discounted her subjective statements describing her medical

impairments and resulting functional limitations. *See id.* at 25–26, 28–29. Her arguments are not

persuasive.

*A.    The Legal Framework*

---

[2] "Light work" involves lifting no more than twenty pounds at a time but frequently lifting objects
weighing up to ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting
requirements can perform light work only if he or she also can "do a good deal of walking or standing, or
do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455
n.1 (4th Cir. 1990).

A claimant's RFC represents her "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite her medical impairments. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted); *see* 20 C.F.R. §§ 404.1545, 416.945. It is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined functionally limiting effects of impairments that are supported by the medical evidence or the claimant's credible symptoms, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment must also "include a narrative discussion describing" how medical facts and nonmedical evidence "support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why he discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977). *See also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). As part of this discussion, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), that the claimant retains a certain ability to sustain work-related activities, *Mascio*, 780 F.3d at 636–37.

B.    *Relevant Evidence*

    *1.    Medical Evidence*

Goins has said that she initially injured her lower back in the spring or fall of 2011, when she lifted something heavy while stocking groceries at work. *See* R. 297, 370, 549. An MRI taken on September 28, 2011, revealed findings consistent with "mild multilevel spondylosis" and "mild intervertebral disc degeneration" in the lumbosacral spine. R. 557; *see also* R. 307, 552. In particular, the reviewing radiologist noted "mild stenosis" and "posterior annular bulging

and mild facet hypertrophy" at the L3-L4, L4-L5, and L5-S1 levels, which appeared "to result in mild compression of the ventral aspect of the thecal sac" at L3-L4 and L4-L5. R. 557. He also observed a "mild chronic appearing compression deformity of the superior T11 endplate . . . on the sagittal sequences." *Id.*

  a.  *Primary Care Providers*

  Vincent Jones, M.D., has been Goins's internist since March 2011, R. 257, and was the physician primarily responsible for managing Goins's medical conditions during the relevant period, including those Dr. Jones diagnosed as polyneuropathy in diabetes, stable osteoarthrosis involving multiple sites, an unspecified back disorder, and chronic pain syndrome. *See* R. 320, 326, 349–50, 360–61, 425–26, 437–38, 456, 458–59, 483, 518, 530, 533, 542, 583, 589. Goins visited Dr. Jones's clinic about once a month between March 2011 and October 2015. *See* R. 406–505, 510–42, 581–89. Treatment records show that Goins repeatedly complained of pain in her lower back, for which Dr. Jones prescribed different opioid pain medications and recommended stretching before any activity, aerobic exercise, and range-of-motion exercises. *See*, *e.g.*, R. 319–20, 327–29, 334–35, 340–41, 502, 504, 518, 525, 583, 586. Several progress notes reflect Goins's reports that taking opioid medication as needed provided enough pain relief "to make a real difference" and that her physical functioning improved with those medications. *See*, *e.g.*, R. 342, 439, 442, 445, 451, 475, 478, 488, 494, 497, 510, 513, 525, 540, 584, 587. In May 2015, Dr. Jones instructed Goins to decrease by half the amount of oxycodone that she took every six hours as needed and recommended that she try a course of physical therapy. R. 518; *see also* R. 512.

Most of Dr. Jones's examination notes dated after January 2012 show that Goins exhibited "abnormal" range of motion in the lumbar spine[3] and usually endorsed "tenderness" to palpation of the spine or surrounding muscles. *See* R. 437 (July 2012), 440 (Aug. 2012), 443 (Sept. 2012), 446 (Dec. 2012), 452 (Jan. 2013), 455 (Mar. 2013), 461 (June 2013), 464 (July 2013), 467 (Aug. 2013), 476 (Dec. 2013), 482 (Feb. 2014), 489 (June 2014), 492 (May 2014), 495 (Mar. 2014), 502 (July 2014), 504 (Aug. 2014), 511 (July 2015), 514 (June 2015), 520 (Apr. 2015), 523 (Mar. 2015), 529 (Jan. 2015), 532 (Dec. 2014), 538 (Oct. 2014), 582 (Aug. 2015), 584 (Sept. 2015), 589 (Oct. 2015). However, other records show there were times during this period when Dr. Jones observed that Goins exhibited "normal" range of motion in the lumbar spine, with flexion to 60 degrees, extension to 25 degrees, and lateral flexion to 25 degrees, and did not endorse tenderness in her back. *See* R. 425 (Mar. 2012), 428 (Apr. 2012), 431 (May 2012), 434 (June 2012), 458 (May 2013), 470 (Oct. 2013), 473 (Nov. 2013), 517 (May 2015), 535 (Nov. 2014), 541 (Sept. 2014). Goins consistently denied "shoulder pain or numbness or tingling sensations" in the upper extremities, and there is no indication that Dr. Jones specifically examined Goins's upper or lower extremities during these routine office visits.[4] *See, e.g.*, R. 319, 322, 325–26, 331, 334, 337, 340, 434, 437, 440, 455, 458, 461, 464, 470, 473. *But see* R. 476, 482, 496 (noting that Goins reported shoulder pain on three occasions between December 2013

---

[3] These examination notes do not quantify or describe the "abnormal" range of motion in the lumbar spine. Goins always had "normal" range of motion in her thoracic spine, with flexion to 45 degrees, lateral flexion to 45 degrees, and rotation to 30 degrees. *See generally* R. 406–505, 510–42, 581–89.

[4] Only two examination notes dated after January 2012 contain findings specific to the musculoskeletal system, and both records show that Goins walked with an antalgic gait during those office visits. R. 470 (Oct. 2013), 517 (May 2015). Examination notes produced shortly before the relevant period show that Goins consistently walked with a stable gait. R. 407 (June 2011), 411 (July 2011), 413 (Sept. 2011), 416 (Oct. 2011), 419 (Nov. 2011), 423 (Dec. 2011). Dr. Jones's examination notes do not document any complaints or findings related to Goins's forearms, hands, or fingers. *See generally* R. 406–505, 510–42, 581–89.

and March 2014, but continued to deny "any symptoms of paralysis" and "numbness or tingling

sensations" in the extremities).

Goins occasionally saw Paul Holyfield, M.D., for routine medical care both before and

during the relevant period. *See* R. 312–13, 506–08. In August 2011, Goins told Dr. Holyfield that

she injured her back while stocking groceries at work, was experiencing "shooting pains down

her right leg, and [was] now unable to work." *See* R. 312. It does not appear that Dr. Holyfield

examined Goins on this visit. R. 312–13. On February 20, 2012, Goins told Dr. Holyfield that

she had quit her job and now had "chronic pain shooting down her right leg." R. 313. She noted

that she was "unable to do much activity" even when taking the opioid pain medication (10mg

Lortab) Dr. Jones prescribed. *Id.* Dr. Holyfield told Goins to continue under Dr. Jones's care and

to consider a "work up for herniated disc and back pain." *See id.* Goins next saw Dr. Holyfield

for her annual visit in February 2013. R. 506. She said that she was "working on disability"

because she had a "chronic back condition and [was] unable to work." *Id.* She also reported that

she had "injured her rotator cuff on the left side and [was] under the care of an orthopedist." *Id.*

Her extremities appeared "normal" on physical examination. *Id.*

b.    *Specialists*

On December 5, 2011, Goins saw Nicholas Qandah, M.D., a neurosurgeon and complex

spine specialist at the Carilion Clinic in Roanoke. R. 549–55. She reported feeling constant pain

in her lower back and both legs after lifting something heavy at work three months earlier. R.

549. She denied numbness or tingling in her lower extremities. *Id.* Laying down and taking

medication (ibuprofen and hydrocodone-acetaminophen) provided "some relief," but the pain got

worse with walking, lifting, twisting, and bending. R. 549–50. On examination, Dr. Qandah

observed that Goins walked with an antalgic gait and endorsed "subjective sensory changes,"

tenderness to palpation of the lumbar region, and "pain" with flexion and extension of unidentified joints. R. 551. Her straight-leg raising test was negative. *Id.* Goins exhibited normal reflexes and full (5/5) motor strength throughout, including in her shoulders, wrists, hands, and fingers. R. 551–52. Dr. Qandah diagnosed spodylitic arthropathy, low back pain, and sciatica, and he recommended that Goins "try a fair bout of conservative therapy" such as rest, heat, and physical therapy. R. 552. Goins chose to try physical therapy and to continue taking 800mg ibuprofen four times daily. *Id.*

Goins returned to Carilion's neurosurgery clinic on May 2, 2012. R. 307–09. She told Zev Elias, M.D., that she still experienced "pain" and "discomfort" in her back and radiating into her right leg. R. 307. She now took 800mg ibuprofen and 10mg Lorcet as needed for pain, but she had not gone to physical therapy as Dr. Qandah recommended. R. 307–08. On examination, Dr. Elias observed that Goins walked with a normal gait and had full (5/5) motor strength in both lower extremities. R. 307. Her straight-leg raising test was negative. *Id.* Sensory testing revealed intact sensation in the left lower extremity and "diffuse, non-dermatomal decrement to light touch in the right lower extremity." *Id.* Dr. Elias explained that the "mild spondylotic changes" and "mild chronic T11 compression fracture" evident on the September 2011 lumbar MRI did "not appear to be surgical[ly] significant," and he also encouraged her to try physical therapy. *Id.* He noted that if Goins still experienced discomfort after four to six weeks of such therapy, "then it may be worthwhile for her to be evaluated by a pain management specialist for consideration of Epidural steroid injections." *Id.* (spelling corrected).

On December 20, 2012, Goins went to Carilion's orthopedic clinic complaining of constant, severe soreness in her left shoulder. R. 386–87. George Henning, M.D., observed that she could not "elevate her [left] shoulder more than about half way to the horizontal in the

coronal plane," but could "almost get it to the horizontal in the frontal plane." R. 388. Goins also endorsed "significant tenderness" under the deltoid muscle and had "trouble getting her arm behind her back [and] across her chest." *Id.* She had "reasonable function" distally, her grip strength was "okay," and she could fully extend her fingers "without any problem." *Id.* X-rays of Goins's left shoulder "failed to show any evidence of fracture, dislocation, or significant arthritis." *Id.* Dr. Henning diagnosed rotator cuff tendinopathy and noted that an MRI might be necessary to rule out a tear. *See* R. 389. He injected Goins's left shoulder with Marcaine and Kenalog, prescribed diclofenac for pain, and gave her some exercises to do at home. *See id.*

Goins's shoulder was "somewhat better" at her next visit with Dr. Henning on January 9, 2013. R. 391–93. Although she still endorsed "some tenderness" in the distal deltoid muscle, her "range of motion [was] slowly picking up" and she could now lift her left arm above the horizontal plane. R. 393. Dr. Henning instructed Goins to continue her home exercises and to return in one month. He also noted that the Marcaine/Kenalong injection had "helped some" and could be repeated in the future. *Id.* In February 2013, Dr. Henning observed that Goins still exhibited "some" loss of abduction in the left shoulder and could lift that arm only to "about 30–40 degrees above the horizontal." R. 397. She had "good" distal function in the left hand. *Id.* Dr. Henning told Goins to take Aleve twice daily for pain and to return in three months. *Id.* On May 7, 2013, Goins had "close to full range of motion in her left shoulder [with] little if any pain," and she denied feeling tender around the deltoid muscle. R. 400. She told Dr. Henning that she was "essentially not taking any medicine" at that time, and she promised to continue her shoulder exercises. R. 401. Dr. Henning instructed Goins to take ibuprofen or diclofenac if the pain returned and to follow up with his clinic as needed. *Id.*

      *c.*    *Medical-Source Opinions*

On August 13, 2013, Richard Surrusco, M.D., reviewed Goins's records submitted to the state Disability Determination Services ("DDS") through June 20, 2013. R. 90–111. According to Dr. Surrusco, these records showed that although Goins had back and leg pain, she had "good ability to stand and walk throughout a normal workday." R. 99, 110. He also noted that Goins's left shoulder tendinopathy limited her ability to reach with that arm, but otherwise did not prevent her from using "both arms and hands normally." *Id.* Dr. Surrusco opined that Goins could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds; sit and stand and/or walk for about six hours each during a normal eight-hour workday; frequently push and/or pull and occasionally reach overhead with the left arm; frequently stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. R. 96–97, 107–08. These restrictions were intended to fully accommodate Goins's documented lumbar pain and "shoulder tendinopathy with reduced abduction" in the left (non-dominant) arm. *Id.*; *see also* R. 94, 96, 105, 107. Dr. Surrusco also noted that Goins retained "unlimited" capacity for climbing ramps/stairs, balancing, handling, fingering, and feeling. R. 97, 108.

Josephine Cader, M.D., largely concurred with Dr. Surrusco's opinions and rationale after reviewing Goins's updated records submitted to DDS through April 17, 2014. *See* R. 121–23, 133–35. However, Dr. Cader opined that Goins should be limited to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps/stairs. *Id.* She explained that all of the restrictions identified in her functional assessment, including the additional limitations on postural activities, were meant to accommodate Goins's lumbar pain and left-shoulder tendinopathy with reduced abduction. *Id.*

On May 2, 2014, Dr. Jones wrote a letter stating that Goins suffered "from chronic back disorder and chronic pain syndrome" for which there was "no healing process." R. 483. He

opined that her condition would never improve and that there was no possibility of her ever

reentering the workforce. *See id.* One month later, Dr. Jones completed a Medical Source

Statement offering his assessment of Goins's physical abilities to do work-related activities. R.

484–87 (June 2, 2014). He opined that Goins could lift/carry less than ten pounds; sit for two

hours and stand/walk for less than two hours in a normal eight-hour workday; and was "limited"

in her ability to push/pull with either the upper or lower extremities. R. 484–85. Asked to

identify the specific "medical/clinical finding(s)" that supported these restrictions, Dr. Jones

listed four symptoms or diagnoses: "chronic pain, osteoarthritis, fibromyalgia, degenerative disc

disease." R. 485. Dr. Jones also opined that Goins was "limited" in her ability to feel, handle,

finger, and reach in any direction, *id.*, but he did not initially describe the extent to which these

functions were impaired or cite any supporting medical/clinical findings, R. 486. In August

2015, however, Dr. Jones clarified that Goins was limited to "frequent" feeling and "occasional"

handling, fingering, and reaching in any direction because "she has neuropathy in both [her]

upper and lower extremities." R. 577.

       *2.     Goins's Statements & Testimony*

     In February 2013, Goins submitted a Pain Questionnaire and an Adult Function Report

describing how her impairments affected her functional abilities and daily activities. R 244–45,

246–53. She reported feeling "some kind of pain all the time" in her neck, lower back, left leg,

left arm, and/or both shoulders. R. 244. Rest, heat, and hydrocodone helped relieve the pain. R.

245. Goins spent most of her days watching television, reading, and laying on a heating pad. R.

246, 250. She could make "quick meals," and she usually washed dishes and did a load of

laundry once per week. R. 248. Goins could care for herself (albeit with some back pain), but

had trouble lifting her left arm when getting dressed. It hurt to lift five pounds, and she could

walk about 200 feet before she needed to stop and rest. R. 251. Goins's conditions "affected" her

ability to use her hands, but she did not identify any specific symptoms or functional limitations.

*Id.*; *see* R. 247–53.

Goins submitted an updated Pain Questionnaire and Adult Function Report in early April

2014.[5] R. 262–69, 270–71. She said that "bulging disc degeneration" caused her to suffer

constant pain in her lower back. R. 270. Sometimes the pain radiated into both hips, too. *Id.* The

pain was "made worse by movement of any kind, even by standing or sitting still for too long."

*Id.*; *see also* R. 244–45, 267. Laying on a heating pad and hydrocodone helped "dull the pain,"

but nothing made it go away. R. 271. Goins could not kneel, squat, stoop, or climb stairs; could

bend for at most "a few seconds"; could not lift "5 pounds or a 24-pack of water"; and could sit

for at most thirty minutes. R. 267, 271. Reaching upwards hurt her back, but she did not report

any pain or difficulty reaching in other directions or using her hands. R. 271; *see also* R. 263,

267. Goins still spent most of her time laying on a heating pad, reading, and watching television.

R. 265–66. Sometimes she walked to the mailbox when the weather was nice and her back

allowed it. R. 262, 265. Otherwise, Goins left her house about once a month for doctors'

appointments and to go grocery shopping. R. 265–66. She could drive herself on these errands.

R. 265.

At the administrative hearing in September 2015, Goins testified that she quit working

when she hurt her back on February 4, 2012. R. 599, 608. She said that she experienced

"constant" pain in her lower back that sometimes radiated into both legs. R. 603–04. Heat and

oxycodone helped the pain and did not cause any adverse side effects. R. 599–600, 602, 607. She

estimated that she could stand and walk for thirty minutes, sit for up to forty-five minutes, and

---

[5] A legal assistant completed these forms based on information that Goins relayed over the telephone. R.
269, 271.

comfortably lift about ten pounds. R. 601, 602. Goins explained that she injured her left rotator

cuff in 2013 and that, although she still had some chronic soreness in that shoulder, she could

reach forward and overhead with her left arm. R. 601, 605–06. She later added that she could not

"keep [her] arms up a long period of time," but could dress, bathe, dry her hair, and brush her

teeth without difficulty. R. 605; *see* R. 602. Goins initially denied any problems with her hands,

R. 601, but she later said that she sometimes experienced a tingling sensation in both hands and

in the fingers on her right hand, R. 606. Her pharmacist "said that he thought it might be a sign

that [her] back was getting worse." *Id.* As she had reported earlier, Goins testified that she went

grocery shopping about once a month, could do housework "a little at a time," and spent "the

better part of the day" laying on her heating pad. R. 602–03. She also testified that living with

chronic, aching back pain made her feel tired all the time. R. 606–07.

C.    *The ALJ's Decision*

ALJ Mates considered Goins's physical impairments and limitations throughout his

written decision. At step two, he found that Goins's "left shoulder difficulty status-post rotator

cuff injury," degenerative disc disease, and obesity were "severe" medical impairments because

they caused "more than minimal limitations in [her] ability to perform basic work-related

activities." R. 74–75; *see* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2015). He also explained that

Goins's diagnosed polyneuropathy was a "non-severe" medical impairment because she did not

report any "ongoing symptoms associated with" that condition and repeated "examinations

showed no significant loss of sensation due to neuropathy." R. 75 (citing R. 406–82, 488–96,

497–505, 510–42, 558–72). At step three, ALJ Mates found that Goins's severe impairments did

not meet or medically equal any listed impairment, including those "for major dysfunction of a

joint" and "disorders of the spine." R. 77. As part of this analysis, he explained that the available

medical evidence did not show either an "inability to perform fine and gross movements effectively" or "an inability to ambulate effectively." *Id.*

ALJ Mates then set out an accurate and thorough summary of all the evidence related to Goins's physical impairments and alleged functional limitations, including diagnostic images, treatment and examination notes, medical-source opinions, and Goins's statements both to her doctors and to the state agency. R. 75–82. After considering this evidence, he found that Goins retained the RFC to perform light work that involved never climbing ladders, ropes, or scaffolds, occasional "postural activities like bending and stooping," and "occasional overhead reaching and pushing/pulling with [the] non-dominant left arm." R. 77 (punctuation altered). By restricting Goins to light work, ALJ Mates also found that she was capable of occasionally lifting/carrying twenty pounds, frequently lifting/carrying ten pounds, and sitting and standing/walking for about six hours each during a normal eight-hour work day. *Id.* (citing 20 C.F.R. §§ 404.1567(b), 416.967(b)). He explained that this RFC finding was supported by "the relatively benign objective findings" on physical exams and diagnostic images; the "limited degree of treatment" Goins received during the relevant period; Goins's "ability to engage in a range of activities of daily living with little to no accommodations" for her impairments; and the DDS physicians' very similar assessments of Goins's physical capacities, which he said "reflect[ed] a thorough review" of the medical evidence available at the time and were "balanced, objective, and consistent with [the] evidence of record" as a whole. *See* R. 82. ALJ Mates gave slightly more weight to Dr. Cader's assessment, which limited Goins to occasional balancing, stooping, kneeling, crouching, crawling, and climbing ramps/stairs. *Id.* He also explained that his RFC finding "further limited [Goins] to occasional pushing/pulling with the

left upper extremity to afford her the maximum benefit given the weight of the evidence of record as a whole." *Id.*; *see* R. 122, 134 ("Push/pull limited to frequent in left upper extremity.").

Additionally, ALJ Mates explained that he gave "little weight" to Dr. Jones's much more restrictive functional assessments because the "checklist-style forms and his brief summary conclusion appear[ed] to have been completed as an accommodation to the claimant," included "only conclusions regarding functional limitations without any rationale for those conclusions," and were "not well supported or consistent with the evidence of record as a whole." R. 82. He also explained that, although Goins's medical impairments could reasonably be expected to cause her alleged symptoms—including intermittent tingling in her hands and constant pain or soreness in her back, legs, and shoulders—he found Goins's statements describing the intensity, persistence, and functionally limiting effects of those symptoms to be only partially credible, *see* R. 78, because "the degree of severity alleged lack[ed] support and consistency with the other evidence of record," R. 81. As support for this finding, ALJ Mates cited Goins's inconsistent statements about whether she ever experienced neuropathy or had trouble using her hands; the "conservative and routine" treatment Goins sought and received for her back and shoulder impairments, which he found had been "relatively effective in controlling" her symptoms; Goins's ability to engage in ordinary daily activities without accommodations; the lack of "significant abnormalities" on diagnostic images; and evidence that "repeated physical examination ha[d] failed to reveal significantly decreased strength, sensation, or range of motion of any extremity, as would be expected" given the "disabling symptoms" and "significant functional limitations" alleged. R. 81–82.

D.     *Analysis*

Goins contends that the ALJ's RFC assessment does not withstand scrutiny because ALJ Mates: (1) should have given "greater weight" to Dr. Jones's treating-source medical opinions; (2) failed to conduct a "function-by-function analysis" and did not "make any specific findings regarding [Goins's] inability to maintain a static work posture, her need to lie down during the day, or her manipulative limitations"; and (3) did not adequately explain why he discounted Goins's statements describing her symptoms generally and rejected those three alleged functional limitations in particular. *See* Pl.'s Br. 20–23, 24, 25–26, 28–29.

       1.    *Dr. Jones's Medical Opinions*

The ALJ must weigh each medical opinion in the claimant's record. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including her symptoms, diagnosis and prognosis, functional limitations, and remaining abilities. *Id.* §§ 404.1527(a)(1), 416.927(a)(1). The regulations classify medical opinions by their source: those from treating sources, and those from non-treating sources, such as examining physicians and DDS medical reviewers. *See id.* §§ 404.1527(c), 416.927(c). A treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[6] *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the opinion is not entitled to controlling weight, then the ALJ must determine how much weight to afford the opinion, taking into account factors such as the nature and extent of the physician's treatment relationship with the claimant,

---

[6] Goins does not argue that Dr. Jones's medical opinions were entitled to controlling weight. Rather, she argues that ALJ Mates should have given those opinions "greater weight" and that his reasons for affording them only "little weight" are not supported by substantial evidence. *See* Pl.'s Br. 22–23.

how well the physician explained or supported the opinion with medical evidence, and the opinion's consistency with the record as a whole. 20 C.F.R. §§ 404.1527(c), 416.927(c). Although treating physicians' medical opinions often deserve deference, the ALJ may discount or reject such an opinion when there is "persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *see Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam); *Hines*, 453 F.3d at 563 n.2. The ALJ must adequately explain the weight assigned to a treating-source medical opinion and the reasons for that weight. *See Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013); *Harder v. Comm'r of Soc. Sec.*, 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014).

Before weighing the available medical opinions, ALJ Mates set out an accurate and thorough summary of the medical evidence produced during the relevant period, including Dr. Jones's treatment and examination notes. R. 75–82. He recognized Dr. Jones's long-standing status as Goins's primary-care physician and noted that Goins went to his office "on a monthly basis for follow-up and medication refill" appointments between November 2011 and July 2015. *See* R. 79–81 (citing R. 318–361,457–462, 488–96, 497–05, 510–42). ALJ Mates found that Dr. Jones diagnosed Goins with disorders, including polyneuropathy secondary to diabetes, "stable osteoarthrosis," "degenerative disc disease/unspecified back disorder, and pain syndrome," and he noted that the physician repeatedly recommended that Goins manage those conditions with "analgesic[s] and therapy/aerobic exercise and stretching." *See* R. 79, 80–81. He also noted that Drs. Qandah, Elias, and Henning recommended similarly "conservative" treatments to manage her back and shoulder impairments. *See* R. 79–82 (citing R. 307, 386–90, 391–93, 397, 400).

ALJ Mates found that most of Dr. Jones's progress notes documented "tenderness and abnormal lumbar range of motion, but otherwise normal findings," on physical exams throughout

the relevant period. *See* R. 79–81 (citing R. 318–82, 406–82, 488–90, 497–505, 510–42). The

records from Carilion's neurosurgery clinic showed that Goins walked with an antalgic gait in

December 2011 and a normal gait in May 2012. R. 79 (citing R. 307, 552). On both occasions,

Goins exhibited full (5/5) motor strength in her lower extremities and her straight-leg raising

tests were negative. *Id.* (citing R. 307, 551–52). ALJ Mates acknowledged that Dr. Henning

observed that Goins had pain and limited range of motion in her left shoulder for several months

during the relevant period, but also that she exhibited "close to full range of motion" with little,

if any, pain by May 2013. R. 79–80 (citing R. 386–401). The few records documenting

examinations of Goins's forearms, hands, and fingers did not reveal any abnormal findings. *Id.*

(citing R. 338, 551–52). He also found that the available diagnostic images showed "mild"

degenerative changes throughout the lumbar spine and "no fracture, dislocation, or significant

arthritis" in the left shoulder. *See* R. 79–81 (citing R. 307–09, 388, 557). Finally, ALJ Mates

noted that the medical record did "not reference significant or ongoing complaints" related to

neuropathy, R. 82, and that repeated examinations failed to reveal either "significant loss of

sensation," R. 75, or an "inability to perform fine and gross movements effectively," R. 77.

    ALJ Mates then summarized and gave "little weight" to the opinions expressed in Dr.

Jones's May 2014 letter and two RFC assessments. R. 81–82 (citing R. 483, 484–87, 573–77).

He explained that Dr. Jones's "check-list style forms and his brief summary conclusion

appear[ed] to have been completed as an accommodation to the claimant, and include only

conclusions regarding functional limitations without any rationale for those conclusions." R. 82.

He also found that this evidence had "no significant probative value because[] it is not well

supported or consistent with the evidence of record as a whole." *Id.*

Goins argues that the ALJ's rationale is not supported by substantial evidence because Dr. Jones "clearly explain[ed] the basis" for severely restricting Goins's physical functions and nothing in the record suggested Dr. Jones's opinions were intended to "accommodate" his long-time patient. Pl.'s Br. 22. She primarily objects that ALJ Mates should have given more weight to the portions of Dr. Jones's assessments which, if credited, compel the conclusion that Goins retains the capacity to perform "less than sedentary" work.[7] *Id.* at 23; *see* R. 484–85, 613. Goins also takes issue with the ALJ's comment that Dr. Jones's assessments were submitted on a "checklist form" because he ultimately credited the DDS physicians' similarly formatted assessments. Pl.'s Br. 22.

ALJ Mates's comment that Dr. Jones's assessments "appear[ed] to have been completed as an accommodation to" Goins, R. 82, is too ambiguous to independently support the minimal weight afforded to the treating physician's medical opinions in this case. *Compare Craig*, 76 F.3d at 589–90 (affirming the ALJ's decision to reject a treating physician's "conclusory opinion based upon Craig's subjective reports of pain"), *with Hall v. Astrue*, No. 7:07cv590, 2008 WL 5455720, at *4 (W.D. Va. Dec. 31, 2008) (recommending reversal where the ALJ impermissibly discounted a "treating physician's opinion based on unsupported conjecture" that the physician was biased in his patient's favor), *adopted by* 2009 WL 187984 (W.D. Va. Jan. 23, 2009). That said, ALJ Mates's overall discussion was sufficiently clear, and the record supports his findings

---

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying [objects] like docket files, ledgers, and small tools." 20 C.F.R. §§ 404.1567(a), 416.967(a). A person who can meet these lifting requirements can perform "the full range of sedentary work" if he or she can sit for about six hours and stand and/or walk for about two hours in a normal eight-hour work day. *Hancock v. Barnhart*, 206 F. Supp. 2d 757, 768 (W.D. Va. 2002); *see also* SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996). At the administrative hearing, the VE testified that a hypothetical person with Goins's vocational profile and the RFC that ALJ Mates identified in his decision could perform certain "light" and "sedentary" occupations. *See* R. 77, 611–12. He also testified that "competitive employment" would not be available to any person who could stand/walk for less than two hours and sit for about two hours in a normal eight-hour workday, *see* R. 484–85, because such "employment is going to require generally eight hours a day in some combination of sitting, standing, and walking." R. 613.

that Dr. Jones did not explain his opinions and that the functional limitations Dr. Jones identified

were "not well supported or consistent with the evidence of record as a whole." R. 82. *See*

*Bishop*, 583 F. App'x at 67 (affirming the ALJ's decision to reject a treating physician's

"opinion and speculation" where, although "the ALJ did not explicitly analyze each of the

[regulatory] factors on the record, the ALJ was clear that he concluded that the doctor's opinion

was not consistent with the record or supported by the medical evidence, which are appropriate

reasons" to reject a treating physician's medical opinion); *Kersey v. Astrue*, 614 F. Supp. 2d 679,

693 (W.D. Va. 2009) (explaining that an ALJ may "assign little to no weight" to a treating

physician's medical opinion, based on the factors set out in 20 C.F.R. §§ 404.1527(c) and

416.927(c) "if he sufficiently explains his rationale and if the record supports his findings").

First, although Goins asserts that Dr. Jones "clearly explain[ed] the basis" for his

opinions, she does not identify any legal or factual error in ALJ Mates's contrary finding. Pl.'s

Br. 22–23; *see Dunn v. Colvin*, 607 F. App'x 264, 271 (4th Cir. 2015) ("We must defer to the

ALJ's assignments of weight unless they are not supported by substantial evidence."); *cf. Carr v.

Berryhill*, No. 6:16cv10, 2017 WL 4127662, at *5 (W.D. Va. Sept. 18, 2017) ("The Court cannot

simply look at the same evidence and reverse the ALJ on the basis that [he] could have reached a

different result."). A treating physician's failure to explain or otherwise support his opinion with

"relevant evidence . . . , particularly medical signs and laboratory findings," 20 C.F.R. §§

404.1527(c)(3), 416.927(c)(3), is a "specific and legitimate" reason for the ALJ to discount that

opinion, *Bishop*, 583 F. App'x at 67, and it is supported by the record in this case. For example,

the Medical Source Statement that Dr. Jones completed in June 2014 gave him the opportunity to

explain the significant limitations he put on Goins's physical capacities and to identify any

"medical/clinical findings" that supported those limitations. R. 484–85. Rather than identify any

objective findings, Dr. Jones simply listed four symptoms or diagnoses: "chronic pain,

osteoarthritis, fibromyalgia, degenerative disc disease." *Id.* Goins's reports that she suffered

"chronic pain" are not objective medical evidence, and the diagnoses alone do not explain why

Dr. Jones would impose such severe restrictions on Goins's abilities to sit, stand, walk, and

lift/carry even a minimal amount of weight. *Id.*; *see Craig*, 76 F.3d at 590 n.2 ("There is nothing

objective about a doctor saying, without more, 'I observed my patient telling me she was in

pain.'"); *Felton-Miller*, 459 F. App'x at 230 ("Felton-Miller's sarcoidosis diagnosis, without

more, does not establish that she suffers from any particular symptoms or limitations."). The ALJ

reasonably found that Dr. Jones's notes documented "intermittent abnormalit[ies]" on Goins's

lower-back exams (with otherwise normal findings) throughout the relevant period, R. 81, but

primarily consisted of diagnoses, Goins's subjective statements, and Dr. Jones's instructions that

she continue taking opioid medications and try stretching, aerobic exercise, and physical therapy

to manage her pain. R. 79–82. *See generally* R. 318–53, 427–82, 488–504, 510–42, 581–89.

Thus, they do not provide independent support for Dr. Jones's "checklist" assessment of Goins's

physical abilities and limitations.[8] R. 82.

---

[8] I find no error in ALJ Mates's accurate comment that Dr. Jones's opinions appear in "checklist-style forms." R. 82. First, contrary to Goins's assertion, ALJ Mates did not say "that he rejected Dr. Jones's opinions because they" were submitted in that format. Pl.'s Br. 22. *See* R. 82 (explaining that Dr. Jones's assessments deserved "little weight" in part because they "include only conclusions regarding functional limitations without any rationale for those conclusions"). Second, considering the ALJ's rationale for crediting the DDS physicians' similarly formatted opinions, R. 82, "[t]he implication here is not a distaste for check-the-box forms generally, but for medical reports that do not contain at least a minimal amount of written explanation." *Cummins v. Colvin*, No. 2:14cv165, 2015 WL 1526188, at *3 (E.D. Va. Mar. 30, 2015) (citing *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)); *accord McConnell v. Colvin*, No. 2:12cv5, 2013 WL 1197091, at *6 (W.D. Va. Mar. 25, 2013) ("Such check-the-box assessments without explanatory comments are not entitled to great weight, even when completed by a treating physician." (citing *Mason*, 994 F.2d at 1065)). Unlike Dr. Jones, Drs. Surrusco and Cader explained that the restrictions they imposed on Goins's physical activities were meant to accommodate evidence showing she was "limited due to lumbar pain [and] tendinopathy with reduced abduction" in the left shoulder. *See* R. 96–97, 107–08, 121–22, 134–35. On this record, it was not unreasonable for the ALJ to find that the DDS physicians' opinions deserved more weight because they "reflect[ed] a thorough review" of the available medical evidence. R. 82; *see* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

As to her manipulative limitations, Dr. Jones did explain that Goins could only "frequently" feel and "occasionally" handle, finger, and reach in any direction because "she has neuropathy in both [the] upper and lower extremities." R. 577. ALJ Mates acknowledged Dr. Jones's rationale, R. 81, but also correctly found that the medical record did not show Goins's "inability to perform fine and gross movements effectively," R. 77, and that multiple providers' examination notes "revealed no significant loss of sensation due to neuropathy," R. 75 (citing R. 406–82, 488–96, 497–505, 510–42, 558–72). Indeed, Dr. Jones's treatment notes do not contain any objective findings indicating abnormal sensation in Goins's upper or lower extremities, and there is no indication that he ever examined Goins's arms, hands, or fingers. Moreover, Goins repeatedly denied experiencing numbness, tingling, or "any symptoms of paralysis" in her extremities. *See, e.g.*, R. 319, 322, 325–26, 331, 334, 337, 340, 434, 437, 440, 443, 446, 449, 455, 458, 461, 464, 470, 473, 476, 482, 495, 496, 501, 504, 511, 520, 523, 529, 535, 538, 541. On this record, it was not unreasonable for the ALJ to find that Dr. Jones failed to adequately explain his opinions and that the functional limitations Dr. Jones identified were "not well supported" by the medical evidence as a whole. R. 82; *see* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3).

Goins's objection to the ALJ's finding that Dr. Jones's functional assessment deserved little weight because it was not "consistent with the record as a whole," R. 82, fails for similar reasons. *See* Pl.'s Br. 22–23. Goins asserts that Dr. Jones's opinions are consistent with examination notes documenting her "limited and abnormal range of motion" in the lumbar spine and the September 2011 MRI showing "mild multilevel spondylosyis," *id.* at 22, but she does not argue that ALJ Mates either mischaracterized these findings in his discussion of the medical record, R. 79–82, or ignored them when weighing Dr. Jones's medical opinions in particular, R.

82. *See Bishop*, 583 F. App'x at 67; *Carr*, 2017 WL 4127662, at *5. Nor does Goins explain how

these "mild" objective findings undermine the ALJ's conclusion that Dr. Jones's restrictive

functional assessments were not consistent with the "relatively benign objective findings"

documented throughout the medical record. R. 81–82; *see* 20 C.F.R. §§ 404.1527(c)(4),

416.927(c)(4). ALJ Mates accurately summarized Dr. Jones's opinions and treatment notes, as

well as the available diagnostic images and examination notes from Drs. Qandah, Elias,

Henning, and Holyfield, in his discussion of the medical evidence. R. 79–81. He then reasonably

found that Goins's "radiology studies [did] not show significant abnormalities" and that

"repeated physical examinations [had] failed to reveal significantly decreased strength, sensation,

or range of motion of any extremity, as would be expected with the degree of limitation alleged."

R. 81. These contrary medical findings provided "specific and legitimate reasons" for ALJ Mates

to reject Dr. Jones's medical opinion in its entirety, *Bishop*, 583 F. App'x at 67, and those

reasons are supported by the record in this case. Accepting Goins's position that Dr. Jones's

opinions deserved greater weight than ALJ Mates judged appropriate in light of the record as a

whole, 20 C.F.R. §§ 404.1527(c), 416.927(c), would impermissibly require this Court to reweigh

conflicting evidence and substitute its judgment for that of agency officials. *See Dunn*, 607 F.

App'x at 271; *Johnson*, 434 F.3d at 653.

    *2.*    *Goins's Credibility*

    Goins next objects that ALJ Mates's RFC assessment is not supported by substantial

evidence because he erred when considering her alleged symptoms and functional limitations.

Pl.'s Br. 23–24, 28–29. The regulations set out a two-step process for ALJs to evaluate a

claimant's symptoms.[9] *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017); 20 C.F.R. §§

---

[9] "Symptoms" are the claimant's "own description of [his or her] physical or mental impairment." 20
C.F.R. §§ 404.1528(a), 416.928(a) (2015).

404.1529, 416.929 (2015); *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996),

*superseded on other grounds by* SSR 16-3p, 2016 WL 1119029 (Mar. 2, 2016). "First, the ALJ

looks for objective medical evidence showing a condition that could reasonably produce the

alleged symptoms." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c), 416.929(c)); *see*

*also Craig*, 76 F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must

evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine

the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a

regular and continuing basis, *see Mascio*, 780 F.3d at 636–37, 639. "The second determination

requires the ALJ to assess the credibility of the claimant's statements about symptoms and their

functional effects." *Lewis*, 858 F.3d at 866 (citing 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4)).

The ALJ cannot reject the claimant's subjective description of her symptoms "solely

because the available objective medical evidence does not substantiate" that description. 20

C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *see also Lewis*, 858 F.3d at 866; *Hines*, 453 F.3d at

565. Rather, he must consider "all the available evidence in the record" bearing on the claimant's

allegations that she is disabled symptoms, such as pain, caused by a medical impairment or

related treatment. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ also must give specific

reasons, supported by "references to the evidence," for the weight assigned to the claimant's

statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013)

(citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). Ultimately, the ALJ's articulated reasons for

discounting a claimant's subjective complaints need only be legally adequate and supported by

substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop*, 583 F. App'x at 68

(citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

ALJ Mates's RFC finding limited Goins to light work with additional limitations on her postural activities and ability to push, pull, and reach overhead with her left arm. R. 77. At the beginning of his RFC analysis, ALJ Mates accurately summarized Goins's testimony that she is "unable to work due to low back pain radiating down the left leg, knee pain when shopping or standing on concrete, occasional tingling in her hands, frequent tiredness," and "some soreness" in the left shoulder. R. 78; *see* R. 599–607. He also discussed Goins's statements describing how these conditions limited specific physical capacities and daily activities, including her comments that she "spends most of the day" laying on a heating pad to relieve her back and leg pain. R. 78; *see* R. 244–45, 246–53, 262–69, 270–71, 601–03. His written decision included an accurate and through summary of the treatment notes and other medical evidence bearing on Goins's allegations that her chronic pain and other symptoms were so severe that she could not work at all. *See* R. 77–82.

After considering this evidence, ALJ Mates found that Goins's medical impairments could reasonably be expected to cause her alleged symptoms, but that her statements describing the intensity, persistence, and limiting effects of those symptoms were "not entirely credible," R. 78, because "the degree of severity alleged lack[ed] support and consistency with the other evidence of record," R. 81. As support for this finding, ALJ Mates cited Goins's inconsistent statements about whether she ever experienced neuropathy or had trouble using her hands; the "conservative and routine" treatment Goins sought and received for her back and shoulder impairments, which he found had been "relatively effective in controlling" her symptoms; Goins's ability to engage in ordinary daily activities without accommodations; the lack of "significant abnormalities" on diagnostic images; and evidence that "repeated physical examination ha[d] failed to reveal significantly decreased strength, sensation, or range of motion

of any extremity, as would be expected" given the "disabling symptoms" and "significant functional limitations" alleged. *See* R. 78, 81–82.

Goins primarily takes issue with ALJ Mates's purported failure "to specifically address [her] allegations regarding difficulty sitting and standing due to pain and weakness, her need to lie down during the day or her manipulative limitations with regard to reaching, handling, and fingering." Pl.'s Br. 28. She urges that ALJ Mates's credibility determination is "not specific enough to provide guidance" as to why he rejected these symptoms and functional limitations because he did "not make specific findings regarding [Goins's] allegations that she cannot maintain a static work posture, must lie down during the day, and can only occasionally reach, handle, and finger." *Id.* I disagree.

"'[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision'" so long as it is clear that the "decision was based on the entire record" and the ALJ's factual findings are supported by substantial evidence. *Reid*, 769 F.3d at 865 (quoting *Dyer v. Barnhart*, 395 F.3d 1205, 1211 (11th Cir. 2005) (per curiam)). ALJ Mates's written decision satisfies these standards. First, contrary to Goins's assertion, ALJ Mates specifically discussed her allegations that chronic pain limited her ability to sit, stand, and walk to "about 30 minutes at a time," R. 78, and he gave specific reasons why "the degree of severity alleged lack[ed] support and consistency" with other relevant evidence in the record. R. 81–82. Goins did not attribute these (or any) functional limitations to "weakness," and neither she nor her doctors specifically said she would be unable "to maintain a static . . . posture" during an eight-hour day. Pl.'s Br. 28; *see* R. 485. ALJ Mates also acknowledged Goins's allegations that she spent most days laying on a heating pad to relieve her pain, R. 78, and he explained why

other relevant evidence tended to undermine her claim that "she cannot work at all," R. 82.[10]

Finally, ALJ Mates explained that his RFC finding limited Goins to "occasional" reaching

overhead and pushing/pulling with the left arm in order to accommodate her complaints of

shoulder pain. *See* R. 77, 82. Additional manipulative limitations—including those expressed in

Dr. Jones's functional assessments and described by Goins in her hearing testimony—simply

were not supported by the record, as ALJ Mates explained throughout his written decision. *See*

R. 75, 77, 78–82. This explanation permits the Court to determine whether the ALJ's articulated

reasons for discounting Goins's statements were legally adequate and supported by substantial

evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop*, 583 F. App'x at 68.

Goins also argues that ALJ Mates's credibility determination is not supported by

substantial evidence because he impermissibly required her "to objectively prove the intensity of

her pain," mischaracterized the "conservative and routine" nature of her treatment, and found

that opioid pain medications had "effectively controlled her symptoms" even though progress

notes "document [her] continued complaints of pain" despite taking medications. Pl.'s Br. 25–26,

28–29. She does not challenge ALJ Mates's finding that she made inconsistent statements about

whether she ever experienced neuropathy or had trouble using her hands. *See id.* This finding

provided legitimate grounds for the ALJ to discount Goins's subjective complaints, and it is

supported by substantial evidence in the record. R. 263, 267, 271, 511, 520, 523, 529, 535, 538,

---

[10] For example, ALJ Mates found that Goins's "daily activities, which include[d] caring for her personal needs, preparing simple meals, driving a car, shopping for groceries, socializing with others, and performing household chores such as cleaning, washing dishes, and doing laundry suggest[ed] a greater level of physical . . . functioning than alleged." R. 82 (citations omitted). Goins argued for the first time at oral argument that these daily activities were not inconsistent with an inability to work on a regular and continuing basis and therefore did not provide a legitimate basis to question her credibility. Nonetheless, the severe limitations Goins testified to at the hearing are inconsistent with her report of more expansive, albeit limited, activities of daily living. Even assuming that Goins is correct, ALJ Mates articulated other legally adequate reasons why he discounted Goins's subjective statements, and those reasons are supported by substantial evidence in the record.

541, 601–02, 605–06; *see Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va.

May 12, 2015) (finding no error in ALJ's adverse credibility determination where claimant's

medical record showed that she either repeatedly failed to report or expressly denied

experiencing the symptoms that she described in her hearing testimony).

Moreover, ALJ Mates did not require that Goins produce objective medical evidence to

corroborate her subjective description of her pain or other symptoms. He merely cited "the

relatively benign objective findings" on diagnostic images and repeated physical examinations as

one factor cutting against Goins's allegations that her medical conditions caused "disabling" pain

and "significant functional limitations," R. 81–82, and that finding is supported by substantial

evidence in the record. For example, although Goins often said that most physical movements

aggravated her pain, *see, e.g.*, R. 249, 269, 313, 549–50, her strength, motor, and physical

examinations were generally within normal limits except for the "abnormal" range of motion that

Dr. Jones typically observed in her lumbar spine, *see* R. 307, 506, 406–82, 488–90, 497–505,

510–42, 551–52. Dr. Jones also repeatedly encouraged Goins to engage in aerobic exercise,

which, as the ALJ noted, "suggest[s] a greater level of physical . . . functioning than alleged." R.

82; *cf. Justus v. Soc. Sec. Admin.*, No. 4:14cv45, 2015 WL 5510921, at *8 (W.D. Va. Sept. 17,

2015) ("[A] treating physician's failure to impose 'symptom-related functional limitations and

restrictions' can weigh against the claimant's credibility." (quoting 20 C.F.R. §§ 404.1529(c)(3),

416.929(c)(3))). ALJ Mates reached a different conclusion than Goins about the severity of her

chronic pain, but he nonetheless acknowledged that her complaints appeared throughout the

medical record and, in his RFC assessment, accounted for them to a degree by restricting her

physical and postural activities. R. 77–82. "An individual does not have to be pain-free in order

to be found 'not disabled,'" particularly where, as here, the ALJ finds that the claimant can work

only "at a lower exertional level" than she did before. *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing *Hays*, 907 F.2d at 1457–58), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011); *see* R. 82–83.

ALJ Mates did find that Goins's treatment was "conservative and routine," consisting primarily of opioid pain medications, which had been "relatively effective in controlling" her symptoms, and that Goins's doctors consistently recommended aerobic exercise, physical therapy, and stretching exercises to manage her back and shoulder pain. R. 81–82. "[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination," *Dunn*, 607 F. App'x at 275, and substantial evidence supports the ALJ's decision to consider it as one factor in discounting Goins's allegations, R. 78. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2015). For example, Dr. Jones routinely prescribed opioid pain medications for Goins to take as needed and recommended that she manage her back pain through aerobic exercises, stretching before activity, and range-of-motion exercises. Drs. Qandah, Elias, and Henning also told Goins to try similar courses of treatment before they would obtain additional diagnostic testing or explore more aggressive options such as epidural injections or spinal surgery. R. 307, 386–401, 552; *see Dunn*, 607 F. App'x at 275 ("[W]e are not presented here with a situation in which there is any suggestion that Appellant required more aggressive treatment yet received conservative treatment for other reasons."). And, although Goins often complained that she had back pain even when taking opioid medications, she also repeatedly told Dr. Jones that these medications improved her physical functioning and provided enough pain relief "to make a real difference." *See, e.g.*, R. 342, 439, 442, 445, 451, 475, 478, 488, 494, 497, 510, 513, 525, 540, 584, 587. It was ALJ Mates's role to weigh this conflicting evidence in determining the extent to which

Goins's pain and other symptoms actually limited her physical capacity to work. *See Johnson*,

434 F.3d at 653 ("Where conflicting evidence allows reasonable minds to differ as to whether a

claimant is disabled, the responsibility for that decision falls on the ALJ." (brackets omitted)).

The routine, non-invasive nature of Goins's treatment and the partial relief afforded by

conservative measures were legitimate grounds for the ALJ to question the severity of her

medical conditions. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom

can be reasonably controlled by medication or treatment, it is not disabling."); *Gregory v. Colvin*,

No. 4:15cv5, 2016 WL 3072202, at *1, *5 (W.D. Va. May 6, 2016) (concluding that the ALJ

reasonably found pain medications, physical therapy, and steroid injections constituted

"conservative" treatment for degenerative disc disease and properly relied on the nature of such

treatment in discounting the claimant's complaints of debilitating lower-back and leg pain),

*adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016).

Considering the objective medical evidence, Goins's course of treatment, her daily

activities, and her inconsistent statements about whether she experienced neuropathy or had

trouble using her hands, the ALJ could reasonably question the severity and limiting effects of

Goins's medical conditions and related symptoms. Goins does not "point to any specific piece of

evidence not considered by" ALJ Mates that might have changed his adverse credibility

determination or his conclusion that Goins's impairments were not disabling. *Reid*, 769 F.3d at

865 (emphasis omitted); *see* Pl.'s Br. 25–26, 28–29. Accordingly, I find that the ALJ's

credibility determination is legally adequate and supported by substantial evidence. *See Bishop*,

583 F. App'x at 68 (citing *Eldeco, Inc.,* 132 F.3d at 1011).

    *3.     Function-by-Function Analysis*

Finally, Goins argues that ALJ Mates's RFC determination is flawed because he did not conduct the required function-by-function analysis of Goins's ability to work on a regular and continuing basis. *See* Pl.'s Br. 23–26 (citing SSR 96-8p, 1996 WL 374184 (July 2, 1996)). Social Security Ruling 96-8p "instructs that the [RFC] 'assessment first must identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations," before the RFC finding can "be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."[11] *Mascio*, 780 F.3d at 636 (quoting SSR 96-8p, 1996 WL 374184, at \*1); *see* 20 C.F.R. §§ 404.1545(b)–(d), 416.945(b)–(d). An ALJ's failure to "perform an explicit function-by-function analysis" does not automatically require reversal and remand, however. *Mascio*, 780 F.3d at 636. "Remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)).

ALJ Mates's RFC finding restricting Goins to "light work" includes a function-by-function analysis of her abilities to lift and carry certain weights; to sit, stand, and walk during an normal eight-hour workday; to reach overhead and push/pull with the left arm; and to perform postural activities like climbing, bending, and stooping. *See* R. 74, 77, 82. ALJ Mates also specifically found that Goins's diagnosed polyneuropathy did not cause "more than minimal

---

[11] Requiring the ALJ to conduct this "initial function-by-function assessment" of the claimant's ability to perform "specific work-related functions" before expressing the RFC in terms of the exertional levels of work largely guards against the risk that the ALJ will "either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *See* SSR 96-8p, 1996 WL 374184, at \*3, \*4; *accord id.* at \*3 ("[W]hen there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case record that there is such a limitation or restriction, the [ALJ] must consider the individual to have no limitation or restriction with respect to that functional capacity." ).

limitations in her ability to perform basic work related functions," such as handling or feeling. R.

75; *see* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2015). Yet, Goins objects that the ALJ did not

"make any specific findings regarding [her] inability to maintain a static work posture, her need

to lie down during the day, or her manipulative limitations," Pl.'s Br. 23–24, and that this

omission "leaves the court to guess," *id.* at 26, about how the he made his RFC determination.

This argument mirrors Goins's primary objection to ALJ Mates's credibility assessment, and it

fails here for the same reasons it did there. As explained, ALJ Mates's thorough narrative

discussion of Goins's RFC makes clear "which evidence [he] found credible and why," *Radford*,

734 F.3d at 295, and adequately explains why he discounted or rejected any "obviously

probative" evidence, *Arnold*, 567 F.2d at 259, indicating that Goins's medical conditions caused

additional or more restrictive functional limitations. R. 75, 77–82. For example, it is clear that

ALJ Mates chose not to include any manipulative limitations in his RFC determination because

he found the DDS physicians' opinions that Goins retained "unlimited" ability to use her hands

and fingers to be more consistent with the record than Dr. Jones's opinion that Goins should be

limited to "occasional" handling and fingering. *See* R. 75, 77, 78, 80, 82. Similarly, the RFC

determination does not reflect Goins's alleged "need to lie down during the day" because ALJ

Mates reasonably found the allegation to be inconsistent with other relevant evidence, including

Goins's own description of her daily activities and her physicians' conservative treatment

recommendations. *See* R. 78, 81–82. Thus, this is not a case where the ALJ overlooked

conflicting evidence about the claimant's work-related abilities or limitations, *see Mascio*, 780

F.3d at 637, or otherwise "failed to 'build an accurate and logical bridge from the evidence to his

conclusion'" regarding the claimant's RFC, *Monroe*, 826 F.3d at 189 (quoting *Clifford*, 227 F.3d

at 872).

Having independently reviewed the entire record, I find that ALJ Mates's RFC determination is supported by substantial evidence. His reliance on the VE's testimony in response to a hypothetical question reflecting this RFC determination, R. 83–84, was also proper. *See Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) (per curiam). The VE testified that a person with Goins's vocational profile and this RFC could perform certain "light" occupations, such as cashier and laundry sorter, R. 611–12, and ALJ Mates found that these occupations offer a significant number of jobs in the national and regional economies, R. 83. Although Goins objects that the VE's testimony was unreliable because it did not include "specific findings regarding [her] inability to maintain a static work posture, her need to lie down during the day, or her manipulative limitations," Pl.'s Br. 24, ALJ Mates was not required to ask the VE about functional limitations he reasonably found were not supported by the record. *See Fisher*, 181 F. App'x at 365 (finding no error where the ALJ's hypothetical question "merely incorporated" an RFC determination that was supported by substantial evidence). Accordingly, I find that the Commissioner's final decision is consistent with the law and supported by substantial evidence in the record. *Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002) (holding that a VE's reliable testimony provides substantial evidence to support the Commissioner's final decision).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Goins's Motion for Summary Judgment, ECF No. 18, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 21, **AFFIRM** the Commissioner's final decision under 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: January 24, 2018

Joel C. Hoppe
United States Magistrate Judge

35